**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION**


RAYBRUN C. BRAMLETT                                                                    PLAINTIFF

V.                                             4:07CV00055 JTR

GLORIA WARREN, et al.                                                               DEFENDANTS


**MEMORANDUM OPINION**


On January 24, 2007, Plaintiff, Raybrun C. Bramlett, a patient and resident in Five Lower

Unit of the Arkansas State Hospital,[1] commenced this § 1983 action against Defendants Gloria

Warren, Velma Clarke, Rosie Briffon, and Dr. George Konis.  In his Complaint (docket entry #2)

and Amended Complaint (docket entry #5), Plaintiff asserts inadequate medical care claims arising

from an incident in which Defendant Gloria Warren, a nurse, allegedly gave him a medication cup

containing bleach, instead of his prescribed liquid medication, and, after he swallowed the bleach,

the other Defendants provided him with inadequate medical care.

---

[1]Mr. Bramlett initially was committed to the Arkansas State Hospital on October 31, 2001, after being acquitted of a felony by reason of a mental defect or disorder.  He was conditionally released on August 2, 2002, and allowed to reside at the Arkansas Partnership Program, which was responsible for monitoring his compliance with his medications and treatment regime.  On March 16, 2005, the Pulaski County Circuit Court revoked Plaintiff's conditional release, and he was returned to custody in the State Hospital.  *See* docket entry #17, Exhibits 1 through 4.

Mr. Bramlett has been diagnosed with Schizoaffective Disorder, Anxiety Disorder, and Antisocial Personality Disorder, with Borderline Personality Disorder.  His GAF score is 34.  *See* January 31, 2006 Psychosocial History Yearly Update, marked for identification as Court's Exhibit 1.  This document originally was marked Joint Exhibit 7.  The parties later stipulated that it should *not* be received into evidence.  The Court has marked this document for identification in order to establish Plaintiff's clinical diagnosis.

In their Answer (docket entry #34), Defendants denied these allegations and affirmatively stated that, at all relevant times, they provided Plaintiff with adequate medical care.

On April 2, 2007, the Court dismissed Plaintiff's claims against Defendant Rosie Briffon. *See* docket entries #6 and #8.  On February 7, 2008, the Court entered an Order (docket entry #45) granting Plaintiff's Motion to Voluntarily Dismiss Defendants Velma Clarke, a nurse, and Dr. George Konis.  This left Gloria Warren as the only remaining Defendant.

On February 20, 2008, the Court conducted a bench trial on Plaintiff's inadequate medical care claim against Defendant Warren.[2]  The Court heard testimony from Plaintiff, Defendant Warren, Dr. George Konis, and Velma Clarke.  The Court also admitted into evidence Joint Exhibits 1 through 6 and 8 through 11.[3]

After carefully considering the testimony of these witnesses and the documents admitted into evidence, the Court makes the following Findings of Fact and Conclusions of Law.

## I. Findings of Fact

1.      At 6:30 a.m. on August 12, 2005, Defendant Warren, who is a licensed practical nurse, reported to work in Five Lower Unit of the Arkansas State Hospital.  Plaintiff was one of the eight to fourteen patients who were residents in that Unit.  There were two other nurses on Defendant Warren's shift, Velma Clarke and Sharon Thompson.

2.      Defendant Warren was responsible for assembling the medications that each patient in the Unit was to receive at morning pill call.  She unlocked the medication room and, using the

---

[2]On May 17, 2007, the parties consented in writing to allow a United States Magistrate Judge to exercise jurisdiction over this case.  *See* docket entry #22.

[3]Before beginning the trial, counsel for Plaintiff and Defendant stipulated, on the record, that they had no objection to the admissibility of these Joint Exhibits.

current medical charts for each patient, selected the prescribed medications.  She placed the pills in trays on a cart.  Each tray was labeled with the patient's name.  She also poured liquid medications for several patients into small medication cups.  These cups, which could each hold up to 1 ounce of medicine,  were marked in five milliliter increments. *See* Joint Exhibit 11.  Finally, Defendant Warren poured juice into eight ounce cups which the patients would use to assist them in swallowing their medications.

      3.      After completing these tasks, Defendant Warren closed and locked the door to the medication room and rolled the cart a few feet to the counter where she would dispense the medication to the patients.  Defendant Warren testified that, between the time she loaded the cart and the time she began dispensing medication to the patients, the cart was always in her custody, control, and line of sight.  No one else was in the medication room when she loaded the cart, and she personally selected and placed all of the medications into the trays on the cart.

      4.      Defendant Warren then instructed the mental health staff workers to gather all of the residents in Five Lower Unit and bring them in for morning pill call.  The patients were allowed to line up at the counter, in the order in which they arrived, to receive their medications.

      5.      Defendant Warren had handled pill call with Plaintiff for a number of months prior to August 12, 2005.  Defendant Warren testified that she had a cordial relationship with Plaintiff.  Plaintiff also testified that, prior to August 12, 2005, he had always gotten along with Defendant Warren.

      6.      According to Defendant Warren's testimony and her August 12, 2005 progress notes (*see* page 4 of Joint Exhibit 1), pill call began at 7:45 a.m.  Plaintiff's "Physician Ordered" prescriptions on that date included the following major medications which were to be given in pill

form:  Depakote, Fluphenazine, Clonezepam, Benstropine, Lorazepam, Hydroxyzine, and Ultram.

Plaintiff also was prescribed a *liquid dose* of 10 mgs. of Haldol.  *See* Joint Exhibit 4.  Defendant

Warren testified that she selected all of the pills Plaintiff was to take on August 12, 2005, and placed

them in his tray on the cart.  She also testified that she poured the 10 mgs. dose of Haldol into a 1

ounce medication cup and placed it in Plaintiff's tray on the cart.

7.      According to Plaintiff, on the morning of August 12, 2005,[4] he was scheduled to

receive a liquid dose of 1000 mgs. of Depakote, not 10 mgs. of Haldol.  Plaintiff stated that he took

Haldol in pill form.  Plaintiff's testimony is contrary to both Defendant Warren's testimony and the

"Physician's Orders" for the medication he was to receive on August 12.  (*See* Joint Exhibit 4.)

8.      Plaintiff testified that his daily liquid dose of 1000 mg. of Depakote filled the 1 ounce

medicine cup to the top.  According to Plaintiff, Defendant Warren handed him a full medicine cup

of what he thought was Depakote and he poured the entire contents of the cup into his mouth.  As

he began to swallow, he realized that he had been given bleach, not Depakote.  According to

Plaintiff, he immediately spit out the bleach that still remained in his mouth and stuck his fingers

down his throat to induce vomiting.  Despite these measures, Plaintiff testified that he still

swallowed some of the bleach.  Plaintiff began shouting that Defendant Warren had tried to kill him

by giving him bleach.

9.      Nurse Velma Clarke heard Plaintiff shouting and came to investigate.  After Plaintiff

told her that he had swallowed bleach, she immediately gave him a carton of 2% milk to drink,

which was the proper antidote for bleach.

---

[4]In his Complaint and Amended Complaint, Plaintiff alleges that the bleach incident took place on February 16, 2006.  At trial, he testified that, after reviewing his medical records, he realized he had made a mistake about the date of the incident.  Plaintiff now concedes that the correct date of this incident was August 12, 2005.

10.     Both Nurse Clarke and Defendant Warren testified that, immediately after the incident, they smelled the empty medication cup, but neither could detect any odor of bleach. Defendant Warren also testified that she did not detect the odor of bleach in the liquid that Plaintiff spit from his mouth.  Finally, Defendant Warren testified that Nurse Sharon Thompson smelled the empty medication cup, and she did not detect the odor of bleach.

11.     According to Defendant Warren, a bottle of bleach was kept in the Nurses' break room in case blood or vomit needed to be cleaned up.  The break room was behind the nurses' station and approximately thirty feet from the medication room.  Defendant Warren stated that she had no recollection of ever seeing bleach in the medication room.  Defendant Warren unequivocally denied putting any bleach in Plaintiff's medication cup on the morning of August 12.  She also remembered pouring a 10 mg. dose of Haldol into the medication cup and, at pill call, handing that cup to Plaintiff.  Both Defendant Warren and Nurse Clarke testified that they do not believe bleach was in the medication cup that Plaintiff was given on the morning of August 12.

12.     Plaintiff admitted that he did not see Defendant Warren or anyone else pour bleach into his medication cup.  According to Plaintiff, on some unspecified date prior to August 12, he told a friend in a telephone conversation about his father having used the "N" word.  The telephone is located near the duty station for nurses in Five Lower Unit, and Plaintiff believes that Defendant Warren may have overheard his conversation and decided to retaliate against him for using the "N" word by putting bleach in his medication cup.  Defendant Warren denied ever overhearing any telephone conversation between Plaintiff and someone else in which Plaintiff used the "N" word.

13.     The Court has no doubt that Plaintiff genuinely believes that his version of the facts are true.  However, the objective evidence weighs heavily against Plaintiff's understanding of these

facts.

        A.     First, the medical records establish that, on August 12, 2005, Plaintiff was to receive a 10 mg. dose of liquid Haldol; not a 1000 mg. dose of liquid Depakote.  *See* Joint Exhibit 4.  Thus, he should have expected his medication cup to contain a small amount of Haldol, rather than a full cup of Depakote.

        B.     Second, Nurse Clarke testified that, immediately after the incident, she did not detect any odor of bleach in the cup.  Plaintiff testified that he liked and respected Nurse Clarke, who he believed had "saved his life" by giving him milk immediately after the incident.  He also testified that he considered Nurse Clarke to be his friend.  In light of the trust Plaintiff placed in Nurse Clarke, it seems improbable that she would lie about whether she smelled the odor of bleach in the medication cup.

        C.     Third, Dr. George Konis, who examined Plaintiff immediately after the incident, testified that he saw *no objective medical finding* which supported Plaintiff's assertion that he had recently ingested bleach.  After his examination of Plaintiff, Dr. Konis called and asked Nurse Clarke what she believed had happened.  Nurse Clarke told him she did *not* believe Plaintiff had been given bleach in his medication cup.

        D.     Finally, on April 25, 2007, after many months of hearing Plaintiff's complaints about pain in his stomach, Dr. Konis ordered an EGD of Plaintiff's esophagus and stomach.  This EGD was performed at the University of Arkansas for Medical Sciences hospital on May 17, 2007.  The results of this endoscopic procedure revealed *no abnormalities* in Plaintiff's esophagus or stomach.

        14.     Dr. Konis testified that, even if Plaintiff had swallowed an entire 1 ounce cup of

bleach and *not* received milk or another antidote, it would have caused him only moderate stomach pain, which would have resolved on its own, without any medical treatment, within 24 to 48 hours. According to Dr. Konis, his research of medical literature suggests that a person must consume 16 ounces or more of bleach before it poses any risk of scarring the lining of the esophagus and stomach.  Plaintiff admitted that he immediately spit out or threw up most, if not all, of the contents in the 1 ounce medication cup, and immediately received a carton of milk to drink.  These admissions by Plaintiff, coupled with Dr. Konis's testimony, make it extremely difficult to accept Plaintiff's testimony concerning the pain and discomfort he has experienced, over many months, as a result of allegedly ingesting far less than 1 ounce of bleach.

15.     Defendant Warren, Nurse Clarke, and Dr. Konis all testified that, out of an abundance of caution, they responded to the incident as if Plaintiff had, in fact, swallowed bleach.  However, all three of these witnesses stated that they did *not* believe Plaintiff had been given any bleach in the medication cup.

16.     Finally, Dr. Konis testified that, *before* August 12, 2005, Plaintiff had a history of indigestion and excessive stomach acid, which sometimes caused him stomach pain and gas. Dr. Konis stated that these symptoms are common side effects of some of the medications Plaintiff was taking.  Dr. Konis also made it clear that, after the August 12 incident, his decisions to prescribe an antacid for Plaintiff and later order an EGD:  (1) were based on the need to treat and better understand the origin and extent of Plaintiff's complaints of stomach pain associated with indigestion and excess stomach acid; and (2) had nothing to do with Plaintiff's allegation that he had ingested a very small amount of bleach on August 12, 2005.

17.     The Court finds that Plaintiff has failed to prove by a preponderance of the evidence

that, on August 12, 2005, Defendant Warren poured bleach into his medication cup and then gave it to him to drink.  The Court further finds Plaintiff has failed to prove by a preponderance of the evidence that Defendant Warren engaged in any other conduct, on or after August 12, 2005, which could support a claim against her for inadequate medical care.

## II.  Conclusions of Law

1.      As an involuntarily-committed mental patient, Plaintiff is protected by the Due Process Clause of the 14th Amendment to the United States Constitution.   Under the 14th Amendment, Plaintiff has a substantive due-process interest in receiving adequate medical care, and in living in conditions of reasonable safety while he is a patient in the Arkansas State Hospital. *Youngberg v. Romeo*, 457 U.S. 307 (1982).

2.      42 U.S.C. § 1983 provides a remedy for alleged deprivations of rights, privileges, or immunities secured by the Constitution that are committed by someone acting under color of state law.   In order for Plaintiff to prevail on his § 1983 claim for inadequate medical care against Defendant Warren, he must prove that the decisions of Defendant Warren, in preparing for and in administering pill call on the morning of August 12, 2005, were "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment."  *Youngberg*, 457 U.S. at 323.

3.      Plaintiff has failed to prove by a preponderance of the evidence that any of Defendant Warren's decisions or actions on August 12, 2005, were a "substantial departure" from the exercise of accepted professional judgment.

4.      The weight of the evidence simply does not support Plaintiff's good faith belief that he was given a medication cup containing a small amount of bleach.  Thus, the Court concludes that

Plaintiff has failed to prove his inadequate medical care claim against Defendant Warren. Consistent with these Findings of Fact and Conclusions of Law, the Court will enter a Judgment in favor of Defendant Warren, and this action will be dismissed with prejudice.

IT IS SO ORDERED this 22nd day of February, 2008.

_____
UNITED STATES MAGISTRATE JUDGE